# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1718-OA |

| | |
|---|---|
| COMPLETE TITLE: | Jeré Fabick,<br>            Petitioner,<br>        v.<br>Tony Evers, in his Official Capacity<br>as the Governor of Wisconsin,<br>            Respondent. |

## ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | March 31, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 16, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

JUSTICES:
HAGEDORN, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, and REBECCA GRASSL BRADLEY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ROGGENSACK, C.J., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the petitioner, there were briefs filed by *Matthew M. Fernholz* and *Cramer, Multhauf & Hammes, LLP*, Waukesha. There was an oral argument by *Matthew M. Fernholz*.

An amicus curiae brief was filed on behalf of Derek Lindoo, Brandon Widiker, and John Kraft by *Richard M. Esenberg, Anthony LoCoco, Luke Berg*, and *Wisconsin Institute for Law and Liberty, Inc.*, Milwaukee. There was an oral argument by *Richard M. Esenberg*.

An *Amicus* curiae brief was filed on behalf of Wisconsin Legislature by *Ryan J. Walsh, John D. Tripoli*, and *Eimer Stahl LLP*, Madison.

For the respondent, there was a brief filed by *Hannah S. Jurss*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Hannah S. Jurss*.

An amicus curiae brief was filed on behalf of Wisconsin Legislature by *Jessie Augustyn* and *Augustyn Law LLC*; with whom on the brief was *Steve Fawcett*, counsel for the assembly speaker.

2021 WI 28

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2020AP1718-OA

STATE OF WISCONSIN                 :          IN SUPREME COURT

**Jeré Fabick,**

     **Petitioner,**

    **v.**

**Tony Evers, in his Official Capacity as the Governor of Wisconsin,**

     **Respondent.**

**FILED**

**MAR 31, 2021**

Sheila T. Reiff
Clerk of Supreme Court

HAGEDORN, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, and REBECCA GRASSL BRADLEY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ROGGENSACK, C.J., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion, in which DALLET and KAROFSKY, JJ., joined.

ORIGINAL ACTION for declaratory judgment. *Declaration of rights; relief granted.*

¶1 BRIAN HAGEDORN, J. Over the last year, a dangerous new virus has spread throughout the world, disrupted our economy, and taken far too many lives. In response, Governor Tony Evers declared multiple states of emergency under Wis.

Stat. § 323.10 (2019-20),[1] triggering a statutory grant of extraordinary powers to the governor and the Department of Health Services (DHS) to combat the emergent threat. The question in this case is not whether the Governor acted wisely; it is whether he acted lawfully. We conclude he did not.

¶2 Wisconsin Stat. § 323.10 specifies that no state of emergency may last longer than 60 days unless it "is extended by joint resolution of the legislature," and that the legislature may cut short a state of emergency by joint resolution. The statute contemplates that the power to end and to refuse to extend a state of emergency resides with the legislature even when the underlying occurrence creating the emergency remains a threat. Pursuant to this straightforward statutory language, the governor may not deploy his emergency powers by issuing new states of emergency for the same statutory occurrence.

¶3 After declaring a state of emergency related to COVID-19 in March 2020, Governor Evers issued executive orders declaring additional states of emergency in July and again in September. In this original action, petitioner Jeré Fabick asks that we declare these second and third COVID-19-related emergencies unlawful under Wis. Stat. § 323.10. We agree that they are unlawful and so declare.

¶4 Since this case was argued, the Governor has declared new states of emergency on an ongoing basis, each declared as or

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

before the prior one expired. And the declaration now in effect, Executive Order #105, was declared the same day the legislature revoked the then-existing state of emergency by joint resolution. Subsequent motions relating to these orders have been filed while the court deliberated on this case. Among them, we have also been asked to determine whether Executive Order #105 was issued in compliance with the law. After receiving briefing on these requests, we conclude that the state of emergency proclaimed in Executive Order #105 exceeded the Governor's powers and is therefore unlawful.

## I. BACKGROUND

¶5 On March 12, 2020, Governor Evers issued Executive Order #72 proclaiming "that a public health emergency, as defined in Section 323.02(16) of the Wisconsin Statutes, exists for the State of Wisconsin." In the order, the Governor explained that "a novel strain of the coronavirus was detected, now named COVID-19," and that "Wisconsin must avail itself of all resources needed to respond to and contain the presence of COVID-19 in the State." The order expired on May 11, 2020, 60 days after it was issued. It was not extended by the legislature.

¶6 On July 30, 2020, Governor Evers issued Executive Order #82, once more proclaiming "that a public health emergency, as defined in Section 323.02(16) of the Wisconsin Statutes, exists for the State of Wisconsin." The Governor again cited the COVID-19 pandemic as justification for the

3

declaration of a public health emergency. On September 22, 2020, before Executive Order #82 expired, Governor Evers issued Executive Order #90 also proclaiming a "public health emergency" as defined by Wis. Stat. § 323.02(16) due to further challenges from the COVID-19 pandemic.

¶7 In November, before Executive Order #90 expired, Fabick petitioned for an original action challenging the validity of Executive Orders #82 and #90 under Wis. Stat. § 323.10. We granted the petition.


II. DISCUSSION

¶8 The question presented is whether Governor Evers exceeded his authority under Wis. Stat. § 323.10 when he proclaimed states of emergency related to COVID-19 after a prior state of emergency, also for COVID-19, had existed for 60 days and was not extended by the legislature.[2] We begin with the Governor's challenge to the justiciability of this claim, and then address the substance of Fabick's challenge.[3]

---

[2] In addition to the statutory argument, the court also asked the parties to address the following: "If Executive Order #82 and Executive Order #90 are authorized by Wis. Stat. § 323.10, whether that statute is an unconstitutional delegation of legislative power to the executive branch." Because we resolve this on statutory grounds, we do not reach this issue.

[3] Executive Order #90 expired in November. Governor Evers stated and followed through on his intention to continue declaring states of emergency under similar theories. It is proper that this court provide clarity on an issue that is of statewide significance, especially when the 60-day limitation on these orders renders timely appellate review difficult. Therefore, even if a mootness concern could be raised, review

4

## A. Justiciability

¶9 Fabick seeks a declaration that Governor Evers acted in violation of Wis. Stat. § 323.10. To obtain declaratory relief, a justiciable controversy must exist. Loy v. Bunderson, 107 Wis. 2d 400, 409-10, 320 N.W.2d 175 (1982). A controversy is justiciable when four conditions are met: (1) "A controversy in which a claim of right is asserted against one who has an interest in contesting it"; (2) "The controversy must be between persons whose interests are adverse"; (3) "The party seeking declaratory relief must have a legal interest in the controversy——that is to say, a legally protectable interest"; and (4) "The issue involved in the controversy must be ripe for judicial determination." Id. at 410; see also Milwaukee Dist. Council 48 v. Milwaukee County, 2001 WI 65, ¶37, 244 Wis. 2d 333, 627 N.W.2d 866 (noting all four conditions must be satisfied). Governor Evers argues that Fabick fails to satisfy the first and third conditions.[4]

¶10 To satisfy the first condition——a claim of right against one with an interest in contesting it——the claim must assert "present and fixed rights" rather than "hypothetical or

---

satisfies generally recognized exceptions to the mootness doctrine. See Marathon County v. D.K., 2020 WI 8, ¶19, 390 Wis. 2d 50, 937 N.W.2d 901 (listing the five mootness doctrine exceptions).

[4] The second and fourth conditions——adversity and ripeness—— are not challenged by the Governor and are clearly satisfied here.

future rights."  Tooley v. O'Connell, 77 Wis. 2d 422, 434, 253 N.W.2d 335 (1977).  The Governor contends Fabick does not have a claim of right because Wis. Stat. § 323.10 creates only a single remedy——legislative action by joint resolution.  We agree the legislature has a substantive right protected by § 323.10, but this does not mean a citizen challenge is off the table.  This is not a hypothetical matter; it is a real contest over legal authority being claimed and exercised right now.  The Declaratory Judgments Act allows litigants to seek a declaration of the "construction or validity" of a statute.  Wis. Stat. § 806.04(2).  That is what Fabick is doing.  As a taxpayer, under our well-established law, he has a legal interest (should taxpayer standing be satisfied) to contest governmental actions leading to an illegal expenditure of taxpayer funds.  And the Governor is the proper party with an interest in defending the lawfulness of his actions.  The first condition is satisfied.

¶11 Under the third condition, Fabick also asserted a legally protected interest, a requirement often voiced in terms of standing.  See Tooley, 77 Wis. 2d at 438.  In this case, Fabick is not challenging any particular orders issued pursuant to the declared states of emergency.  Rather, he argues he has taxpayer standing to challenge the state of emergency itself, and we agree.  "In order to maintain a taxpayer's action, it must be alleged that the complaining taxpayer and taxpayers as a class have sustained, or will sustain, some pecuniary loss."  S.D. Realty Co. v. Sewerage Comm'n of the City of Milwaukee, 15 Wis. 2d 15, 21, 112 N.W.2d 177 (1961).  During oral argument,

6

the Governor's counsel confirmed that the National Guard had been deployed pursuant to the emergency declarations.[5]   This expenditure of taxpayer funds gives Fabick a legally protected interest to challenge the Governor's emergency declarations.

¶12  We therefore conclude Fabick's action is justiciable and turn to the merits of his claim.

---

[5] When the initial orders were challenged before us, it appears the then-existing federal-state funding placed upon Wisconsin taxpayers the responsibility to fund 25 percent of the National Guard forces deployed in response to COVID-19.  See https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-extension-use-national-guard-respond-covid-19-facilitate-economic-recovery/ (noting the federal government funded 75 percent of the cost).  As the dissent notes, it appears the federal government may now be choosing to fund 100 percent of the National Guard expenditures.  See Dissent, ¶98. The dissent suggests that this change means Fabick has lost the standing he had earlier in the case.  However, a century's worth of precedent makes clear that threatened, as well as actual, pecuniary loss can be sufficient to confer standing.  See Warden v. Hart, 162 Wis. 495, 497, 156 N.W. 466 (1916) (noting a taxpayer has standing when the taxpayer is "threatened with or suffers a pecuniary loss"); see also, Krier v. Vilione, 2009 WI 45, ¶20, 317 Wis. 2d 288, 766 N.W.2d 517 ("the plaintiffs must show that they suffered or were threatened with an injury to an interest that is legally protectable"); State ex rel. First Nat. Bank of Wis. Rapids v. M & I Peoples Bank of Coloma, 95 Wis. 2d 303, 308, 290 N.W.2d 321 (1980) (same); Marx v. Morris, 2019 WI 34, ¶35, 386 Wis. 2d 122, 925 N.W.2d 112 (same).  If National Guard funding may be altered by the stroke of the President's pen, as President Biden has apparently done, this status quo can certainly be altered again.  Taxpayer funds have already been spent in support of National Guard deployments pursuant to these emergency powers.  The imminent threat of unreimbursed costs, past and future, is sufficient to confer taxpayer standing on Fabick under the circumstances of this case.

### B. Interpreting Wis. Stat. § 323.10

¶13 Fabick's petition asks us to declare that Executive Orders #82 and #90 proclaimed states of emergency contrary to Wis. Stat. § 323.10's duration limitations.

¶14 At the outset, we must remember that our constitutional structure does not contemplate unilateral rule by executive decree. It consists of policy choices enacted into law by the legislature and carried out by the executive branch. Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶31, 393 Wis. 2d 38, 946 N.W.2d 35. Therefore, if the governor has authority to exercise certain expanded powers not provided in our constitution, it must be because the legislature has enacted a law that passes constitutional muster and gives the governor that authority.

¶15 Some may wish our analysis would focus on ensuring the Governor has sufficient power to fight COVID-19; others may be more concerned about expansive executive power. But outside of a constitutional violation, these policy concerns are not relevant to this court's task in construing the statute. Whether the policy choices reflected in the law give the governor too much or too little authority to respond to the present health crisis does not guide our analysis. Our inquiry is simply whether the law gives the governor the authority to successively declare states of emergency in this circumstance.[6]

---

[6] The dissent, in contrast, spends considerable space discussing outcome-focused concerns. But our role is not to rule in favor of outcomes we like; it is to interpret and apply the law, whether we like it or not.

8

## 1. Statutory Structure

¶16 The legislative policy choice that decides this case is found in the text of Wis. Stat. § 323.10 along with its incorporated definitions. When interpreting statutory text, our assignment "is to determine what the statute means so that it may be given its full, proper, and intended effect." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. To find this meaning, we interpret the text "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id., ¶46; see also Wis. Stat. § 990.01(1).

¶17 Here is the full text of Wis. Stat. § 323.10:

The governor may issue an executive order declaring a state of emergency for the state or any portion of the state if he or she determines that an emergency resulting from a disaster or the imminent threat of a disaster exists. If the governor determines that a public health emergency exists, he or she may issue an executive order declaring a state of emergency related to public health for the state or any portion of the state and may designate the department of health services as the lead state agency to respond to that emergency. If the governor determines that the emergency is related to computer or telecommunication systems, he or she may designate the department of administration as the lead agency to respond to that emergency. A state of emergency shall not exceed 60 days, unless the state of emergency is extended by joint resolution of the legislature. A copy of the executive order shall be filed with the secretary of state. The executive order may be revoked at the

discretion of either the governor by executive order or the legislature by joint resolution.

¶18 The first sentence gives the governor authority to "issue an executive order declaring a state of emergency." Wis. Stat. § 323.10. The governor may declare the state of emergency "for the state or any portion of the state." Id. And the condition enabling the governor to declare a state of emergency——the "enabling condition," as we will call it——is the governor's determination "that an emergency resulting from a disaster or the imminent threat of a disaster exists." Id. A "disaster" is specifically defined in Wis. Stat. § 323.02(6). It "means a severe or prolonged, natural or human-caused, occurrence that threatens or negatively impacts life, health, property, infrastructure, the environment, the security of this state or a portion of this state, or critical systems, including computer, telecommunications, or agricultural systems." § 323.02(6).

¶19 The second sentence of Wis. Stat. § 323.10 describes a state of emergency related to public health. It is similar, but contains key distinctions. The governor first has to "determine[] that a public health emergency exists." Wis. Stat. § 323.10. The enabling condition here is a "public health emergency," a phrase that is separately defined in Wis. Stat. § 323.02(16)——a definition we'll turn to shortly. When that enabling condition is satisfied, the governor "may issue an executive order declaring a state of emergency related to public health for the state or any portion of the state." § 323.10.

10

¶20 As the Governor reads it, the first sentence of Wis. Stat. § 323.10 is the operative, overarching, authorizing sentence allowing a state of emergency to be declared in the event of a disaster. In his telling, the next two sentences simply state which agency leads the response for certain types of emergencies——DHS serving as the lead agency for public health emergencies. This reading is incorrect.

¶21 The first two sentences of Wis. Stat. § 323.10 contain parallel but distinct authorizing language. If the second sentence merely clarifies that DHS may be the lead agency, the first half of that sentence (the governor "may issue an executive order declaring a state of emergency related to public health for the state or any portion of the state") would be meaningless. It is only the second half of the sentence that empowers the governor to "designate [DHS] as the lead state agency to respond to that emergency." Id. Nor would a "public health emergency" be a separately-delineated enabling condition. The legislature could have just defined a public health emergency as another kind of "disaster." It did not. The enabling condition for a state of emergency related to public health is a "public health emergency," not a "disaster," each term having its own separate definition.

¶22 Moreover, the public health emergency authorization is different than the language that follows it in Wis. Stat. § 323.10: "If the governor determines that the emergency is related to computer or telecommunication systems, he or she may designate the department of administration as the lead agency to

11

respond to that emergency." Here, the reference to computer or telecommunication systems explicitly ties back into the definition of a disaster in Wis. Stat. § 323.02(6), which specifies that a disaster can be an "occurrence that threatens or negatively impacts . . . critical systems, including computer [and] telecommunications." Notably, this sentence contains no separate authorizing language.

¶23 In short, the governor's emergency powers under Wis. Stat. § 323.10 describe two types of emergencies, each with its own enabling condition: a "disaster" as defined in Wis. Stat. § 323.02(6), and a "public health emergency" as defined in § 323.02(16).[7]

¶24 The executive orders under review here[8] declared states of emergency related to public health due to ongoing challenges

---

[7] The dissent suggests the word "occurrence" rather than the phrase "enabling condition" is the more appropriate lens through which we should read the statute. However, the word "occurrence" is nowhere to be found in Wis. Stat. § 323.10. Rather, the governor's powers in § 323.10 are framed as a type of if-then statement (albeit without an explicit "then"). That is, if and only if the governor finds a condition met may he declare a certain type of emergency. We use the phrase "enabling condition" to explain what the statute clearly says. It requires the condition be satisfied in order to enable, or trigger, the ability to declare a state of emergency and deploy emergency powers. The dissent's focus instead on the term "occurrence" ignores that a "public health emergency" may be declared upon either "the occurrence or imminent threat of an illness or health condition." Wis. Stat. § 323.02(16) (emphasis added). Therefore, the dissent's attempt to tie Wis. Stat. § 323.10's duration limitations solely to the term "occurrence" misses the mark.

[8] Executive Order #105, which was issued and raised after initial briefing had been completed, is separately discussed below.

in responding to COVID-19. All three proclaimed "that a public health emergency, as defined in Section 323.02(16) of the Wisconsin Statutes, exists for the State of Wisconsin." When exercising this power, Wis. Stat. § 323.10 contains additional relevant limits on the governor: the enabling condition and duration limitations.

## 2. Enabling Condition

¶25 Wisconsin Stat. § 323.02(16) defines the enabling condition for a state of emergency related to public health as follows:

> "Public health emergency" means the occurrence or imminent threat of an illness or health condition that meets all of the following criteria:
>
> (a) Is believed to be caused by bioterrorism or a novel or previously controlled or eradicated biological agent.
>
> (b) Poses a high probability of any of the following:
>
> 1. A large number of deaths or serious or long-term disabilities among humans.
>
> 2. A high probability of widespread exposure to a biological, chemical, or radiological agent that creates a significant risk of substantial future harm to a large number of people.

¶26 No one disputes that COVID-19 meets this definition. COVID-19 is an "illness or health condition" caused by "a novel . . . biological agent" that poses a high probability of death, a risk sadly realized for thousands of Wisconsinites, hundreds of thousands Americans, and millions more worldwide. Even if it were a close call——and it's not——Wis. Stat. § 323.10

13

leaves the determination that a public health emergency exists to the governor ("If the governor determines"). In any event, COVID-19 presents a public health emergency that enables the governor to declare a state of emergency related to public health under § 323.10. That however, does not end the analysis because § 323.10 imposes a second set of limitations on the governor's power.

### 3. Duration Limitations

¶27 This brings us to the duration-related limitations in Wis. Stat. § 323.10. The statute provides that a state of emergency "may be revoked at the discretion of either the governor by executive order or the legislature by joint resolution," and a "state of emergency shall not exceed 60 days, unless the state of emergency is extended by joint resolution of the legislature." § 323.10. These directives can be distilled into three statutory commands. First, the initial duration of a state of emergency is determined by the governor, but it "shall not exceed" 60 days. Second, a state of emergency may be cut shorter than the initial duration by either the governor through executive order or by the legislature through joint resolution. Finally, a state of emergency may be extended longer than 60 days by the legislature alone.

¶28 These are clear statutory commands, plainly stated. They compel the conclusion that the legislature enacted Wis. Stat. § 323.10's time-limiting language to meaningfully constrain the governor's authority to govern by emergency order.

14

The plain language of the statute explains that the governor may, for 60 days, act with expanded powers to address a particular emergency.  Beyond 60 days, however, the legislature reserves for itself the power to determine the policies that govern the state's response to an ongoing problem.  Similarly, when the legislature revokes a state of emergency, a governor may not simply reissue another one on the same basis. Therefore, where the governor relies on the same enabling condition for multiple states of emergency, or declares a new state of emergency to replace a state of emergency terminated by the legislature, the governor acts contrary to the statute's plain meaning.  If it were otherwise, § 323.10's duration-limiting provisions would cease to perform any meaningful function.  These limitations would be no more than perfunctory renewal requirements and would serve as merely a trivial check on indefinite emergency executive powers.  The text of § 323.10 therefore must be read to forbid the governor from proclaiming repeated states of emergency for the same enabling condition absent legislative approval.[9]

---

[9] See Midwest Inst. of Health, PLLC v. Gov. of Mich., ___ N.W.2d ___, 2020 WL 5877599, *6-8 (Mich. 2020) (interpreting similar time-limiting language in a Michigan statute empowering the governor to declare states of emergency to impose meaningful time constraints on the governor's power).

¶29  This straightforward reading of Wis. Stat. § 323.10 is further confirmed by related provisions and statutory context.[10] Its statutory neighbor, Wis. Stat. § 323.11, outlines a similar emergency declaration power for local governments.[11]  If certain conditions support it, a local government may declare an emergency by the "governing body of any local unit of government."  § 323.11.   But notably, "The period of the emergency shall be limited by the ordinance or resolution to the time during which the emergency conditions exist or are likely to exist."  Id.   This unmistakably shows that when the legislature wishes to authorize an emergency response that is coextensive with the emergency conditions, it knows how to say so.   And quite conspicuously, it did not say so in the immediately preceding section, § 323.10, discussing the governor's ability to declare a state of emergency.  The most reasonable way to read these provisions together, as we must, is that the governor's power is more circumscribed.  The governor's power to act unilaterally on an emergency basis is limited by both a 60-day limit and by the legislature's power to terminate the emergency declaration.

---

[10] See State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes.").

[11] The emergency powers of local governments are described in Wis. Stat. § 323.14(4).

¶30 Statutory history supports this interpretation as well.[12] The original predecessor to modern-day Wis. Stat. § 323.10 was enacted in the 1950s during an escalating Cold War. It authorized the governor to proclaim a state of emergency "[w]hen the governor finds that a disaster due to an act of war is imminent or has occurred." Wis. Stat. § 21.02(2) (1955-56). This statute contained no time limit at all, stating: "The governor shall revoke the proclamation by order, or the legislature may revoke the proclamation by joint resolution, whenever either shall deem it appropriate." Id. However, it also required the governor to "call the legislature into special emergency session." Id. The natural expectation was that the legislature would have something to say about how Wisconsin should respond to ongoing threats.

¶31 In 1959, the law was amended. Ch. 628, Laws of 1959. It expanded the circumstances under which an emergency may be declared to when "an emergency resulting from enemy action

---

[12] "By analyzing the changes the legislature has made over the course of several years, we may be assisted in arriving at the meaning of a statute." Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581 (citing Kalal, 271 Wis. 2d 633, ¶69). Statutory history, which "encompasses the previously enacted and repealed provisions of a statute," "is part of a plain meaning analysis." Id.; see also Wis. Stat. § 990.001(7) ("A revised statute is to be understood in the same sense as the original unless the change in language indicates a different meaning so clearly as to preclude judicial construction."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 256 (2012) ("If the legislature amends or reenacts a provision other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning.").

exists" or when "an emergency growing out of natural or man-made disaster, except from enemy action, exists." Wis. Stat. §§ 22.01(4)(e), 22.02(1) (1959-60). The legislature removed the requirement that the legislature be called into session, however. Instead, it imposed time limitations on emergency declarations.[13] For enemy-action-related disasters, the legislature added: "The period of the state of emergency shall not extend beyond 60 days unless extended by joint resolution of the legislature." § 22.01(4)(e) (1959-60). And for natural or man-made disasters, "The period of the state of emergency shall not extend beyond 30 days unless extended by joint resolution of the legislature." § 22.02(1) (1959-60). This basic framework remained for decades, albeit with some reorganization and other minor changes.

¶32 Then in 2002, the legislature adopted portions of a Model State Emergency Health Powers Act ("MSEHPA") that had been

---

[13] Chapter 628, Laws of 1959, was initially proposed to the legislature by the Office of Civil Defense. In its initial form, the proposal did not contain a time limitation. Citing constitutional concerns with the mandatory legislative session call in the 1955 law, the proposal eliminated the requirement that the governor call a special session after declaring a state of emergency. Through the legislative process, the legislature agreed to eliminate the requirement to call a legislative session, but it added the time limit, replacing one constraint on emergency power with another.

Although we tread carefully when drawing inferences from legislative history, the evidence from the drafting process here supports reading Wis. Stat. § 323.10's time-limiting language to meaningfully check the governor's emergency powers. See Kalal, 271 Wis. 2d 633, ¶51 (noting that legislative history may be consulted to confirm a plain meaning interpretation).

18

proposed in the wake of 9/11.[14]  These revisions, adopted in 2001 Wis. Act 109, added the public health emergency to Wisconsin law.   2001 Wis. Act 109, §§ 340j, 340L.   The legislature borrowed extensively from the model act in drafting these provisions, including its definition of a "public health emergency."  MSEHPA § 104(m) (Ctr. for L. and the Pub.'s Health at Georgetown and Johns Hopkins Univs., Proposed Official Draft Oct. 23, 2001); 2001 Wis. Act 109, § 340j.   But the legislature did not adopt every model provision.   Notably, it did not adopt the proposal to allow the governor to renew the public health emergency declaration every 30 days.   MSEHPA § 405(b).   Rather, it incorporated this language into its already-existing emergency declaration language with its already-existing time limitations.  2001 Wis. Act 109, § 340L.

¶33  In 2009 Wis. Act 42, the legislature renumbered the statute as Wis. Stat. § 323.10 and added emergencies related to computer or telecommunications systems.   2009 Wis. Act. 42, § 72.   It also eliminated the 30- and 60-day distinction and adopted a universal 60-day limit for all states of emergency. Id.

¶34  Viewing this history as a whole, it confirms the plain meaning of the statutory language.   The initial time-unlimited

---

[14] The September 11, 2001 attacks were "the deadliest terrorist attacks on American soil in U.S. history."  Nineteen terrorists undertook a series of airline hijackings, crashing the hijacked aircraft into occupied buildings.  Tragically, nearly 3,000 people lost their lives in the attacks. https://www.britannica.com/event/September-11-attacks.

state of emergency with a call for a legislative session was restructured, creating a time-limited set of emergency powers, extendable only by the legislature and subject to the legislature's termination. The governor—and, in a public health emergency, DHS—are given some time to exercise extraordinary powers when an emergency occurs. This is the nature of an emergency; it is an unplanned event that warrants immediate attention and may not lend itself to a timely legislative response.

¶35 In this context, it makes sense that the legislature would allow the executive branch to exercise emergency powers only on a temporary basis. During a state of emergency, the statutes give the governor expanded powers, including the ability to:

- Prioritize some emergency-related contracts over others, Wis. Stat. § 323.12(4)(a);
- Issue orders "for the security of persons and property," § 323.12(4)(b);
- Enter into contracts to respond to the emergency, § 323.12(4)(c);
- Suspend administrative rules, § 323.12(4)(d); and
- Waive fees for certain permits, licenses, or approvals, § 323.12(4)(e).

A state of emergency related to public health triggers additional statutory powers. For example, DHS is given temporary power to purchase vaccines, Wis. Stat. § 250.042(2)(a), to order individuals to be vaccinated, Wis.

20

Stat. § 252.041(1)(a), and to isolate or quarantine individuals who are unable or unwilling to be vaccinated, § 252.041(1)(b). Also, under Wis. Stat. § 252.06, certain expenses incurred during a state of emergency related to public health may be paid from specific appropriations, meaning a declared public health emergency can require state taxpayers to pay for certain expenditures. See § 252.06(10)(c).[15]

¶36 The statutory language suggests the legislature gave the executive branch expansive, but temporary, authority to respond to emergencies.[16] When the governor employs those powers beyond the time limits imposed by the legislature, or after revocation of those powers by the legislature, he wields authority never given to him by the people or their representatives. We conclude that Wis. Stat. § 323.10's duration-limiting language forbids the governor from declaring successive states of emergency on the same basis as a prior

---

[15] We cite and perfunctorily summarize these powers to illustrate the expanded authority reflected in the statutory design. We do not interpret these provisions here, nor do we opine on the constitutionality of any of these or other related provisions.

[16] The dissent finds it an absurd result that a governor's power to act on an emergency basis would be temporary and terminable by the legislature when a threat like the present virus exists for an extended period of time. Quite the contrary. It is not only not absurd, it is eminently reasonable to think that the legislature drafted a law that conferred limited executive power to act unilaterally, but reserved for itself the power to enact or not enact laws to guide the state through a prolonged crisis. Legislative, rather than executive, policy-making is how our constitutional design ordinarily works.

21

state of emergency, and that the governor may not reissue a new emergency declaration following legislative revocation of a state of emergency declared on the same basis.

## C. Application

¶37 In support of the challenged emergency declarations before us, the Governor argues the 60-day limit is no bar to multiple declarations of emergency based on the same public health emergency. Our analysis above forecloses this interpretation. But the Governor makes an alternative argument. He asserts that each declaration was supported by differing on-the-ground conditions related to COVID-19. In essence, he argues the ups and downs of COVID-19 have created independent enabling conditions thereby renewing his power to declare a new state of emergency with each new front in the fight against COVID-19. The dissent agrees. It argues that a new emergency may be declared as long as the governor drafts "a new set of on-the-ground facts." Dissent, ¶116.

¶38 This approach, however, does what a proper consideration of the entire statute does not permit——it reads the duration limitations right out of the law. A governor will surely have little difficultly drafting a new emergency order stating that the challenges or risks are a little different now than they were last month or last week. So long as the emergency conditions remain, the governor would possess indefinite emergency power under this atextual theory. The more reasonable reading is that the 60-day time limit and legislative

22

revocation power are real limitations that constrain the governor's power to deploy emergency powers with regard to that emergency.  Statutory restrictions on executive power cannot be avoided by modest updates to the "whereas" clauses of an emergency declaration.

¶39 We recognize that determining when a set of facts gives rise to a unique enabling condition may not always be easy.  But here, COVID-19 has been a consistent threat, and no one can suggest this threat has gone away and then reemerged.  The threat has ebbed and flowed, but this does not negate the basic reality that COVID-19 has been a significant and constant danger for a year, with no letup.  In the words of the statute, the occurrence of an "illness or health condition" caused by a "novel . . . biological agent" has remained, unabated.

¶40 In this case, we conclude that Governor Evers relied on the same enabling condition for the states of emergency announced in Executive Orders #72, #82, and #90.  The states of emergency proclaimed in Executive Orders #82 and #90 therefore reached beyond the power given to the governor under Wis. Stat. § 323.10, impermissibly extending the use of emergency powers in violation of the time limitations explicit in the statute.  It matters not that the legislature did not take action to revoke these emergency declarations initially challenged by Fabick.  Whether the legislature exercises its authority to terminate an unlawfully declared state of emergency has no bearing on whether it was lawful.

¶41 Several times in briefing before this court, and at oral argument, the Governor suggested Wis. Stat. § 323.10's provision giving the legislature authority to revoke a state of emergency supported his reading of the 60-day time limit as permitting renewals precisely because the legislature had an effective check. Since this case was argued, however, the legislature did revoke the state of emergency declared in Executive Order #104, only to have a new one——in Executive Order #105——immediately declared by the Governor. In post-argument motions and briefing, Fabick asks that we declare Executive Order #105 invalid as well. This case has come to us on a petition for original action and, somewhat atypically, it touches subsequent and evolving orders on the same matters. Therefore we believe the ongoing emergency orders are properly before us. After hearing from both parties, we conclude it is appropriate for us to address Executive Order #105.[17]

¶42 As we have discussed, Wis. Stat. § 323.10 provides that an emergency declaration order "may be revoked at the discretion of . . . the legislature by joint resolution." In order to have any effect, this provision must mean that the governor may not simply reissue an emergency declaration revoked

---

[17] The dissent focuses on Fabick's more limited request for a temporary injunction of Executive Order #105, but he did request permanent relief as well. Fabick plainly seeks a decision from this court making clear that Executive Order #105 was issued in excess of the Governor's powers. The declaratory relief we choose to grant in this case is appropriate.

24

by the legislature.[18] Any other interpretation would render the legislature's statutory power to revoke an emergency declaration illusory. The statute gives the legislature the power to override a governor's declaration of emergency, not the other way around.

¶43 The Governor defends Executive Order #105 as different than Executive Order #104 on something he says is new——the purported loss of federal nutrition benefits——along with updates regarding the current threats presented by COVID-19. However, if an emergency declaration is a prerequisite to receiving these funds, this was no less true during the operation of Executive Order #104, which the legislature revoked. The Governor cannot make an end run around legislative revocation simply by itemizing a previously unidentified justification for the state of emergency. Reading the statute to encourage a game of whac-a-mole between the governor and legislature would defeat Wis. Stat. § 323.10's explicit legislative check on the governor's emergency power. The legislature has exercised its statutory

---

[18] In its original merits briefing, the Governor repeatedly assured the court that the legislature had the power to end a state of emergency. For example, the Governor argued, "Wis. Stat. § 323.10 explicitly empowers the Legislature to determine the propriety of an executive order declaring a state of emergency. If the Legislature concludes Governor Evers improperly issued Executive Order 90, the Legislature may revoke it at will." And again, "If the Legislature believes the Governor has issued an improper state of emergency order, it can take immediate action to end it."

25

power to revoke Executive Order #104. Accordingly, we declare Executive Order #105 unlawful.[19]

### III. CONCLUSION

¶44 Read according to its plain language, in context, along with surrounding statutes, and consistent with its purpose, the best reading of Wis. Stat. § 323.10 is that it provides the governor the authority to declare a state of emergency related to public health when the conditions for a public health emergency are satisfied. But when later relying on the same enabling condition, the governor is subject to the time limits explicitly prescribed by statute. Therefore, we declare that Executive Orders #82 and #90——both of which declare a public health emergency in response to COVID-19——were unlawful under Wis. Stat. § 323.10.

¶45 We also received a motion and briefing on the lawfulness of Executive Order #105. Based on the legislature's revocation of Executive Order #104, a power specifically granted to the legislature in Wis. Stat. § 323.10, we declare Executive Order #105 unlawful as well.[20]

---

[19] As a necessary consequence, all executive actions and orders issued pursuant to the powers triggered by the emergency declaration are likewise void.

[20] In addition, Fabick asked us to take judicial notice of Executive Orders #95 and #104. We have already taken judicial notice of Executive Order #95, and we also take judicial notice of Executive Order #104. Fabick also sought a temporary injunction of Executive Order #105, which is denied as moot.

26

*By the Court.*——Rights declared; relief granted.

¶46 REBECCA GRASSL BRADLEY, J. *(concurring).* "[W]e have a government of laws and not of men."[1] Governor Tony Evers' successive declarations of emergency——each stemming from the COVID-19 pandemic——violate the law, specifically Wis. Stat. § 323.10's express temporal limitation: "A state of emergency shall not exceed 60 days unless the state of emergency is extended by joint resolution of the legislature." Because the Wisconsin Legislature never extended Governor Evers' declared state of emergency, it ended on May 11, 2020. Any exercise of executive power in the name of the COVID-19 pandemic beyond that date is unlawful unless the people consent, through their elected representatives in the legislature.

¶47 Governor Evers' interpretation of Wis. Stat. § 323.10 as a license to unilaterally decree consecutive states of emergency based upon the same underlying cause would violate the structural separation of powers embedded in the Wisconsin Constitution, rendering the statute an unconstitutional delegation of legislative power to the executive branch. In preservation of the people's inherent right to liberty, the Framers of the United States Constitution devised a system of separate and distinct powers among the three branches of government. "To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: 'The accumulation of all powers, legislative, executive, and judiciary, in the

---

[1] Morrison v. Olson, 487 U.S. 654, 697 (Scalia, J., dissenting) (citing Part the First, Article XXX, of the Massachusetts Constitution of 1780).

1

same hands, whether of one, a few, or many, . . . may justly be pronounced the very definition of tyranny.' The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961)." Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶4, 376 Wis. 2d 147, 897 N.W.2d 384 (alterations in original). The Framers were inspired by the wisdom of Montesquieu: "There can be no liberty where the legislative and executive powers are united in the same person." The Federalist No. 47, at 302 (quoting Baron de Montesquieu, XI The Spirit of the Laws 216 (John Nourse and Paul Vaillant eds., 1758)). The people of Wisconsin adopted the same separation of governmental powers in our state constitution.

¶48 We sustain this separation of powers without exception, even in a pandemic. Accordingly, this court does not consider the prudence of particular measures to address the pandemic; such policy decisions rest with the legislature, not the judiciary. This case is about who has the power to make those decisions. The Wisconsin Constitution answers that question——it is the legislature's duty to make the laws that govern our lives, the governor's duty to execute them, and the judiciary's duty to ensure they comport with the constitution. The legislature enacted a law empowering the governor to respond to a public health emergency within a period prescribed by the legislature, after which his authority expires unless extended by the people's representatives in the legislature. The majority opinion reaffirms the principle established in Wisconsin Legislature v. Palm last year: "in the case of a

2

pandemic, which lasts month after month, the Governor cannot rely on emergency powers indefinitely."[2]

I

¶49 While this case may be resolved by applying the plain language of the statute, the constitutional infirmities of Governor Evers' interpretation of the law warrant discussion. An understanding of the structure of our government is a prerequisite to grasping the constitutional flaws in the Governor's analysis. "Like its federal counterpart, '[o]ur state constitution . . . created three branches of government, each with distinct functions and powers,' and '[t]he separation of powers doctrine is implicit in this tripartite division.'" Gabler, 376 Wis. 2d 147, ¶11 (quoted source omitted; alterations in original). "Three clauses of the Wisconsin Constitution embody this separation [of powers]: Article IV, Section 1 ('[t]he legislative power shall be vested in a senate and assembly'); Article V, Section 1 ('[t]he executive power shall be vested in a governor'); and Article VII, Section 2 ('[t]he judicial power . . . shall be vested in a unified court system')." Id. (citation omitted).

¶50 Elected officials on whom the people have conferred powers may not circumvent the constitutional confines of their authority even if "they believe that more or different power is necessary." A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529 (1935). This fundamental principle underlying the foundation of our government prevails even in an emergency

_____

[2] 2020 WI 42, ¶41, 391 Wis. 2d 497, 942 N.W.2d 900.

3

because "[e]xtraordinary conditions do not create or enlarge constitutional power." Id. at 528. Even in a pandemic, the government "cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained." Id. at 530.

¶51 The Wisconsin Constitution prohibits unlawful delegations of power among the branches as a bulwark for the people. "By vesting certain powers exclusively within each of the three co-equal branches of government, the drafters of the Wisconsin Constitution recognized the importance of dispersing governmental power in order to protect individual liberty and avoid tyranny." League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶31, 387 Wis. 2d 511, 929 N.W.2d 209 (citation omitted). In specifying the powers of each branch, the constitution prohibits one branch from assuming the powers of another and also forbids one branch from ceding its own powers to another. "The co-ordinate branches of the government . . . should not abdicate or permit others to infringe upon such powers as are exclusively committed to them by the Constitution." Rules of Court Case, 204 Wis. 501, 514, 236 N.W. 717 (1931). "Each branch's core powers reflect 'zones of authority constitutionally established for each branch of government upon which any other branch of government is prohibited from intruding. As to these areas of authority, . . . any exercise of authority by another branch of government is unconstitutional.'" Gabler, 376 Wis. 2d 147, ¶31 (quoting State

4

*ex rel. Fiedler v. Wisconsin Senate*, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990)) (ellipsis in original; emphasis omitted).

¶52 Because Wisconsin adopted a tripartite division of powers between the executive, legislature, and judiciary modeled after the United States Constitution, founding era principles "inform our understanding of the separation of powers under the Wisconsin Constitution." *Id.*, ¶11. "The Founders designed a Constitution to safeguard individual rights and liberty." *Koschkee v. Taylor*, 2019 WI 76, ¶56, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, concurring). William Blackstone——who "profoundly influenced" the Founders' conception of the separation of powers——"defined a tyrannical government as one in which 'the right both of making and of enforcing the laws, is vested in one and the same man, or one and the same body of men,' for 'wherever these two powers are united together, there can be no public liberty.'" *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 73 (2015) (Thomas, J., concurring) (quoting 1 William Blackstone, *Commentaries on the Laws of England* 129, 134, 137-38 (1765)). "The Founders recognized that maintaining the formal separation of powers was essential to preserving individual liberty." *Koschkee*, 387 Wis. 2d 552, ¶51 (Rebecca Grassl Bradley, concurring).

> This devotion to the separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it. The Framers were concerned not just with the starting allocation, but with the "gradual concentration of the several powers in the same department." The Federalist No. 51, at 321 (J. Madison).

5

_Ass'n of Am. Railroads_, 575 U.S. at 74 (Thomas, J., concurring).

¶53 The Framers "believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty." _Gundy v. United States_, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting). With this in mind, the Framers enshrined the separation of powers in our Constitution in order to "preserve individual freedom." _Olson_, 487 U.S. at 727 (Scalia, J., dissenting); _see also_ _Ass'n of Am. Railroads_, 575 U.S. at 75 (Thomas, J., concurring) ("At the center of the Framers' dedication to the separation of powers was individual liberty."). "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the separation of powers. The Federalist No. 47, at 301; _see also_ The Federalist No. 51, at 321-22 (James Madison) (Clinton Rossiter ed., 1961) ("[The] separate and distinct exercise of the different powers of government . . . is admitted on all hands to be essential to the preservation of liberty."). Renouncing England's monarchical rule, the Framers adopted a structure under which the government was accountable to the people; power would not go unchecked; and citizens could "readily identify the source of legislation . . . affect[ing] their lives." _See_ _Ass'n of Am. Railroads_, 575 U.S. at 57 (Alito, J., concurring). Absent this structural separation of powers, Madison feared there would be "gradual concentration of the several powers in the same department." The Federalist No. 51, at 321-22.

6

¶54 Acknowledging the dangers of accumulated power, the Framers precluded each branch of government from delegating its own vested powers. "By careful design," the Framers designed a framework under which "[w]hen the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it." Ass'n of Am. Railroads, 575 U.S. at 61, 68 (Thomas, J., concurring). In other words, given that "each of these vested powers had a distinct content," the Framers contemplated that each respective department——and only that department——could carry out its constitutionally-conferred powers. See Gundy, 139 S. Ct. at 2133 (Gorsuch, J., dissenting).

¶55 This case concerns the legislative function, and the legislature's authority to transfer it to another branch of government. "The people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws." Gabler, 376 Wis. 2d 147, ¶60. Safeguarding constitutional limitations on the exercise of legislative power is particularly important in light of its awesome sweep. "When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons——the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" Gundy, 139 S. Ct. at 2133 (Gorsuch, J., dissenting) (citing The Federalist No. 78

7

(Alexander Hamilton) and <u>Fletcher v. Peck</u>, 10 U.S. 87, 136 (1810)). In the Constitution, the "people had vested the power to prescribe rules limiting their liberties in Congress <u>alone</u>"——not the executive. <u>Id.</u> (citation omitted). As expressed by John Locke, whose political philosophy greatly influenced the Framers' formation of our Republic, "[t]he legislative cannot transfer the power of making laws to <u>any other hands</u>; for it being but a delegated power from the people, they who have it cannot pass it over to others." John Locke, <u>Second Treatise of Civil Government</u> § 141, at 71 (John Gough ed., 1947) (emphasis added).

¶56 Because the people gave the legislature its power to make laws, the legislature alone must exercise it. Our constitutional structure confers no authority on any branch to subdelegate any powers the sovereign people themselves delegated to particular governmental actors. After all, "when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them." <u>Id.</u> Any laws prescribed beyond the constitutional lines of authority drawn by the people are illegitimate: "nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them." <u>Id.</u>

II

¶57 Although conflict between Governor Evers and the legislature over the State's COVID-19 pandemic response is often presented as partisan in nature, this court's review is not.

8

This court does not referee partisan battles; our duty is to ensure that each branch of government respects the constitutional limits of its authority. "[E]nforcing the separation isn't about protecting institutional prerogative or governmental turf. It's about respecting the people's sovereign choice to vest the legislative power in Congress alone. And it's about safeguarding a structure designed to protect their liberties, minority rights, fair notice, and the rule of law." Gundy, 139 S. Ct. at 2135 (Gorsuch, J., dissenting).

¶58 Just like the federal framework, Wisconsin's Constitution protects against any of the three branches of government abdicating their constitutionally-vested powers. "[I]t is . . . fundamental and undeniable that no one of the three branches of government can effectively delegate any of the powers which peculiarly and intrinsically belong to that branch." Rules of Court Case, 204 Wis. at 503. "Core powers," as this court has recognized, "are not for sharing." Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶47, 382 Wis. 2d 496, 914 N.W.2d 21. Nevertheless, this court has upheld delegations of legislative power to the executive, provided there are "adequate procedural safeguards" in place to limit executive overreach.[3]

¶59 Relying on the procedural safeguard embodied in Wis. Stat. § 323.10, which empowers the legislature to revoke the governor's declared state of emergency by joint resolution,

---

[3] Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971); Westring v. James, 71 Wis. 2d 462, 468, 238 N.W.2d 695 (1976); Gilbert v. State, Med. Examining Bd., 119 Wis. 2d 168, 186, 349 N.W.2d 68 (1984).

9

Governor Evers initially argued that "[i]t cannot possibly be that when the Legislature explicitly has the final say on the matter, it has given away too much power." Dismissing the petitioner's concern over the prospect of the governor promptly declaring a new state of emergency upon the legislature's revocation of the prior one as "rank speculation," the Governor himself acknowledged that "such a scenario" "may very well implicate separation of powers problems." Citing Panzer v. Doyle,[4] Governor Evers further conceded that declaring a new state of emergency after the legislature revoked the prior one "may be circumventing the procedural safeguards that insure that delegated power may be curtailed or reclaimed by future legislative action" warranting the successive declaration of a state of emergency "be struck down."

¶60 That was the Governor's argument in November 2020. On February 4, 2021, the legislature passed a joint resolution revoking Governor Evers' fifth order declaring a state of emergency related to the COVID-19 pandemic. That very day, the Governor declared another one, casting aside the very procedural safeguard he invoked to validate the legislature's delegation of emergency management power. In response to the petitioner's motion for injunctive relief, the Governor asserted a new basis for his latest emergency order——Wisconsin's potential loss of emergency FoodShare funds——the preservation of which ostensibly requires a state of emergency order. Characterizing the deprivation of food assistance as a disaster distinct from the

---

[4] 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666.

COVID-19 pandemic, the Governor neglects to explain how the face-covering mandate in his latest order bears any relationship to food assistance for Wisconsin citizens. When the legislature passed a bill granting the Governor the power to declare a public health emergency for the sole purpose of preserving Wisconsin's entitlement to FoodShare funds as well as other emergency allotments, the Governor vetoed it.[5] The Governor justified the veto, at least in part, based on the limits the bill imposed on the ability of his administration to control public gatherings. The Governor's actions illustrate why this court "must be assiduous in patrolling the borders between the branches. This is not just a practical matter of efficient and effective government. We maintain this separation because it provides structural protection against depredations on our liberties." Tetra Tech EC, 382 Wis. 2d 496, ¶45.

III

¶61 Although Governor Evers' violation of Wis. Stat. § 323.10's procedural safeguards suffices to strike down his declarations of successive states of emergency after May 11, 2020, the procedural safeguards test is a judicial invention, existing in tension with the constitution's clearly demarcated separation of powers among the branches. Over time, this court

---

[5] Wis. Assem. 2, to Senate Am. 1, to Assem. Am. 1, to Senate Substitute Am. 1, to Assem B. (Jan. 28, 2021), available at https://docs.legis.wisconsin.gov/2021/related/amendments/ab1/aa2_sa1_aa1_ssa1_ab1.

Governor Tony Evers, Governor's Veto Message (Feb. 5, 2021), available at https://docs.legis.wisconsin.gov/2021/related/journals/assembly/20210205efe1/_70.

has loosened the constitutional limits on delegating legislative power to the executive branch. The constitutionally-grounded doctrine of nondelegation morphed into a doctrine of delegation within limits drawn by the judiciary, rather than the people. In this regard, Wisconsin's jurisprudence followed the federal path. The history is readily traceable.

¶62 In the early days of our Republic, the United States Supreme Court succinctly articulated the separation of powers: "the legislature makes, the executive executes, and the judiciary construes the law." Wayman v. Southard, 23 U.S. 1, 22 (1825). By 1928, the Court discarded these first principles in favor of the "intelligible principle" test: "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise delegated power] is directed to conform, such legislative action is not a forbidden delegation of legislative power." J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928). Although this rule remains in place, see Gundy, 139 S. Ct. at 2123, it is quite apparent that it supplanted the Constitution's separation of powers.

¶63 The Constitution "contain[s] a discernible, textually grounded non-delegation principle that is far removed from the modern doctrine." Gary Lawson, Delegation and Original Meaning, 88 Va. L. Rev 327, 333 (2002). "[T]he Constitution does not speak of 'intelligible principles.' Rather, it speaks in much simpler terms: 'All legislative Powers herein granted shall be vested in a Congress.'" Whitman v. American Trucking Ass'ns,

12

Inc., 531 U.S. 457, 487 (2001) (Thomas, J., concurring). As some members of the current Court have recently recognized, "[i]f Congress could pass off its legislative power to the executive branch, the vesting clauses and indeed the entire structure of the Constitution, would make no sense." Gundy, 139 S. Ct. at 2134-35 (Gorsuch, J., dissenting). If Congress could permissibly delegate its vested powers, "legislation would risk becoming nothing more than the will of the current President." Id. at 2135. Departures from the nondelegation doctrine reflect each branch's willingness to "abandon openly a substantial portion of the foundation of American representative government." Lawson, supra, at 332.

¶64 In the early years of Wisconsin's statehood, this court understood that the three branches of government could not delegate their vested powers, imposing substantive limitations on the legislature's assignment of authority to the executive to carry out the legislature's policies. In Dowling, this court declared "a law must be complete, in all its terms and provisions, when it leaves the legislative branch of the government, and nothing must be left to the judgment of the electors or other appointee or delegate of the legislature." Dowling v. Lancashire Ins. Co., 92 Wis. 63, 65 N.W. 738, 741 (1896) (emphasis added). However, in the wake of the Progressive era, this court began to uproot substantive limits on the legislature's delegation of its constitutionally-conferred powers, thereby damaging the "foundation of American

13

representative government" that is the separation of powers. Lawson, supra, at 332.

¶65 As is often the justification for casting aside constitutional principles, this court abandoned the nondelegation doctrine in the name of "necessity." In 1928, conterminously with the United States Supreme Court, this court explained that "courts, Legislatures, and executives, as well as students of the law, agree, . . . that there is an overpowering necessity for a modification of the doctrine of separation and non-delegation of powers of government." State v. Whitman, 196 Wis. 472, 220 N.W. 929, 941 (1928). Eviscerating the Wisconsin Constitution's separation of powers, the Whitman court held that the legislature "may delegate" to agencies "the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose." Id. Gone was any substantive limit on the legislature's delegation of authority; the legislature could now delegate its legislative powers so long as the court agreed it was necessary to carry out the legislative purpose. Of course, neither branch sought nor obtained the people's consent to this brazen rewriting of the constitution.

¶66 Whitman ushered in a new era for this court's ever-evolving abandonment of non-delegation principles. Forty years thereafter, this court approved any delegating statute merely "if the purpose of the delegating statute is ascertainable and there are procedural safeguards to insure that the board or agency acts within that legislative purpose." Watchmaking

14

*Examining Bd. v. Husar*, 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971). The court reiterated this position five years later, upholding "broad grants of legislative powers . . . where there are procedural and judicial safeguards against arbitrary, unreasonable, or oppressive conduct of the agency." *Westring v. James*, 71 Wis. 2d 462, 468, 238 N.W.2d 695 (1976). Over the ensuing decades, the court fortified its deviation from first principles, continuing to uphold "broad grants of legislative powers." In *Gilbert*, this court acknowledged that throughout the "evolution of the delegation of legislative power" effectuated by the judiciary, it has "take[n] a more liberal attitude toward delegations of legislative authority." *Gilbert v. State, Med. Examining Bd.*, 119 Wis. 2d 168, 186, 349 N.W.2d 68 (1984). More accurately, the constitution's substantive limitations on delegating authority are all but dead. In their place survives judicial complacence with transfers of legislative power, "[s]o long as there are adequate procedural safeguards" in place to limit executive overreach. *Id.*

¶67 Proposals to reinvigorate the nondelegation doctrine are often met with warnings about the adverse impact on the government's ability to operate efficiently. Governmental efficiency can never be allowed to trump the people's liberty. As Madison noted, "the separate and distinct exercise of government . . . [is] *essential* to the preservation of liberty." The Federalist No. 51, at 321 (emphasis added). As reflected in Madison's enduring words, and consistent with the plain text and

15

original meaning of the United States and Wisconsin Constitutions, the legislature may not delegate its vested powers to the executive.

¶68 Reviving the nondelegation doctrine would restore the original understanding of the constitutional grants of authority; they "'are exclusive,' which means 'only the vested recipient of that power can perform it.'" Koschkee, 387 Wis. 2d 552, ¶47 (Rebecca Grassl Bradley, concurring) (citing Ass'n of Am. Railroads, 575 U.S. at 67 (Thomas, J., concurring)). Following the Framers' model, the Wisconsin Constitution ensures this "separation of powers 'operate[s] in a general way to confine legislative powers to the legislature.'" Id. (citation omitted) (emphasis added). "[E]ver vigilant in averting the accumulation of power by one body——a grave threat to liberty——the people devised a diffusion of governmental powers. These powers may not be claimed by another branch." Gabler, 376 Wis. 2d 147, ¶60.

IV

¶69 In this case, the court appropriately applies the plain language of the statute to overturn executive overreach. Governor Evers' interpretation of his emergency management powers would render Wis. Stat. § 323.10 unconstitutional. According to the Governor, the legislature gave the executive the unilateral authority to declare successive states of emergency, based upon the same underlying cause, with no prescribed end date, and without the approval (much less the input) of the legislature. During a declared state of

16

emergency, Wis. Stat. § 323.12 gives the Governor the extraordinary power to "[i]ssue such orders as he [] deems necessary for the security of persons and property." § 323.12(4)(b). Under the Governor's reading, if the Governor wills it, then so it shall be——for as long as the Governor alone decrees a public health emergency exists. Such a grant of plenary legislative power could not survive even cursory constitutional scrutiny.

¶70 The people of Wisconsin gave the power to legislate to the legislature alone. Accordingly, "a law must be complete, in all its terms and provisions, when it leaves the legislative branch or the government, and nothing must be left to the judgment of the electors or other appointee or delegate of the legislature." Dowling, 92 Wis. at 65. Governor Evers' construction of Wis. Stat. § 323.10 would leave the exercise of extraordinary power entirely to the judgment of the executive, unlimited in duration. As the Governor would have it, so long as he alone thinks the cause of a public health emergency persists, he retains the unchecked power to keep Wisconsin in a perpetual state of emergency, leaving the individual liberties preserved by the people at the birth of our nation and at the founding of our state to the whim of a single executive. "Freedom of men under government," as John Locke wrote, "is to have a standing rule to live by, common to every one of that society, and made by the legislative power erected in it . . . and not subject to the inconstant, uncertain, unknown, arbitrary will of another man." Ass'n of Am. Railroads, 575

17

U.S. at 72-73 (Thomas, J., concurring) (quoting John Locke, Second Treatise of Civil Government § 22, at 13 (John Gough ed., 1947)). If the legislature had actually abdicated its vested powers to the executive, as the Governor would have it, the people of Wisconsin would be subject to the arbitrary will of a single man. The Wisconsin Constitution does not countenance such a consolidation of extraordinary power.

¶71 Under Governor Evers' interpretation, the constitutional separation of powers between the executive and legislative branches would collapse for the duration of any public health emergency. Every 60 days, so long as the underlying cause of the emergency persists, the executive could declare another state of emergency, granting the Governor the extraordinary powers delineated in Wis. Stat. § 323.12——indefinitely. Such unilateral, unchecked power was anathema to the framers of our constitutions.

> By separating the lawmaking and law enforcement functions, the framers sought to thwart the ability of an individual or group to exercise arbitrary or absolute power. And by restricting lawmaking to one branch and forcing any legislation to endure bicameralism and presentment, the framers sought to make the task of lawmaking more arduous still.

United States v. Nichols, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting). While some may find the limitations on the Governor's power frustrating, particularly in the midst of a pandemic, those limitations exist to protect our liberty. "Admittedly, the legislative process can be an arduous one. But that's no bug in the constitutional design: it is the very point of the design." Gutierrez-Brizuela v. Lynch, 834 F.3d

18

1142, 1151 (10th Cir. 2016) (Gorsuch, J., concurring). Escaping the imposition of a single ruler's dictates on the people impelled the founding fathers to risk their lives, their fortunes, and their sacred honor in 1776.[6]

* * *

¶72 "In America THE LAW IS KING! For as in absolute governments the king is law, so in free countries the law ought to be king; and there ought to be no other." Thomas Paine, Common Sense (1776). In Wisconsin, the legislature empowered the governor to respond to a public health emergency. Statutorily, those powers "shall not exceed 60 days, unless the state of emergency is extended by joint resolution of the legislature." Wis. Stat. § 323.10. In response to the COVID-19 pandemic, Governor Evers declared a state of emergency on March 12, 2020. The legislature never extended it. Accordingly, any orders issued by the Governor more than 60 days thereafter are unlawful and void. While a pandemic will not follow the laws of men, the Governor must. I respectfully concur.

¶73 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

---

[6] See Declaration of Independence (U.S. 1776) ("And for the support of this Declaration, with a firm reliance on the protection of divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor.").

19

¶74 ANN WALSH BRADLEY, J. *(dissenting).* This is no run-of-the-mill case. We are in the midst of a worldwide pandemic that so far has claimed the lives of over a half million people in this country. And with the stakes so high, the majority not only arrives at erroneous conclusions, but it also obscures the consequence of its decision.[1] Unfortunately, the ultimate consequence of the majority's decision is that it places yet another roadblock to an effective governmental response to COVID-19, further jeopardizing the health and lives of the people of Wisconsin.

¶75 First, the majority errs by granting taxpayer standing to Fabick on a conjured justification neither briefed nor argued by any party. In essence, the product of this new theory results in a standard so low that all that is needed for taxpayer standing in this court is a song and a whistle with an ability to produce a melody appealing to at least four justices.

¶76 Such an institutional injury alone should be sufficient to cause the majority to pause. Yet, in support of its new theory it proceeds to cause further institutional damage by sub silentio overruling more than a century of taxpayer standing cases.

¶77 Second, the majority errs by purporting to engage in a straightforward statutory analysis. Yet, it omits any analysis of an essential word in Wis. Stat. § 323.02(16) that is outcome determinative. Left unanalyzed is the statutory term

---

[1] The majority's entire discussion of the consequence is tucked away in a one sentence footnote towards the end of the opinion. See majority op., ¶43 n.19.

1

"occurrence," which when included in the analysis, proves to undermine the majority's conclusion and mandates a contrary result.

¶78 In a final flourish of judicial immodesty, the majority goes beyond the relief requested and declares Executive Order #105 unlawful with scant analysis and without candid justification. Obscuring the fact that Fabick did not move for the relief it grants, the majority reaches out and strikes down Order #105 even though that order is not properly before the court.

¶79 Contrary to the majority's conclusions, I determine that because Fabick and the State of Wisconsin suffer no pecuniary loss whatsoever, Fabick fails to meet the condition necessary for asserting taxpayer standing. Without taxpayer standing, this case simply can no longer be maintained.

¶80 Further, I conclude that Executive Orders #82 and #90 are premised on statutory occurrences that are distinct from each other and from that relied upon for Executive Order #72. Therefore, they are permissible pursuant to the Governor's authority under Wis. Stat. § 323.10.

¶81 Finally, I would deny Fabick's motion to temporarily enjoin Order #105. In addition to Order #105 not being properly before the court and Fabick's lack of standing to challenge it, the majority's conclusion regarding Order #105 finds no textual support.

¶82 Accordingly, I respectfully dissent.

2

I

¶83 Since its emergence in late 2019, COVID-19 has quickly and devastatingly enveloped the globe, and Wisconsin has been ravaged with high case counts and tragic deaths. As of this writing, over 27,000 Wisconsinites have been hospitalized and over 6,500 have died.[2] The emergencies presented by the arrival and spread of COVID-19 have spurred the Governor to issue several executive orders declaring various states of emergency.

¶84 On March 12, 2020, recognizing the danger of the spread of COVID-19 around the world and seeing a need "to prepare for the impacts [the virus] may have on the state[,]" Governor Tony Evers issued Executive Order #72. This order, among other things, declared a public health emergency in the state and designated the Department of Health Services (DHS) as the lead agency to respond.

¶85 Neither the legislature nor the Governor revoked this order prior to its expiration 60 days later, on May 11, 2020.[3] Upon the expiration of Order #72, the Governor declared no state of emergency for the next 79 days despite the continuing presence of COVID-19 in Wisconsin.

¶86 The Governor waited until July 30, 2020, and then declared a new state of emergency, in the form of Executive

---

[2] Wisconsin Department of Health Services, COVID-19: Wisconsin Summary Data, https://www.dhs.wisconsin.gov/covid-19/data.htm#summary (last visited Mar. 29, 2021).

[3] See Wis. Stat. § 323.10 ("The executive order may be revoked at the discretion of either the governor by executive order or the legislature by joint resolution.").

Order #82, in response to a "new and concerning spike in infections." Again, neither the Governor nor the legislature revoked Order #82, and it expired on September 28, 2020.

¶87 However, six days before Order #82 was to expire, the Governor issued Executive Order #90 declaring a new public health emergency, this time in response to the significant increase in the spread of COVID-19 due to the beginning of the K-12 and collegiate school years. Once again, the legislature did not revoke Order #90.

¶88 With the legislature declining to act, and in so doing tacitly acquiescing to the Governor's orders,[4] Fabick, a single Wisconsin resident, filed suit as a taxpayer. He brought his suit as an original action before this court, arguing that the Governor lacks the statutory authority to declare successive states of emergency "arising from the same public health emergency." He acknowledges, however, that in certain circumstances, the Governor can make such a declaration for a different COVID-19 related public health emergency. With regard to standing, Fabick contended that he has standing to maintain this action as a taxpayer because the Governor utilized government funds in drafting, promoting, and enforcing Orders #82 and #90.

---

[4] Curiously, although it has the authority to act to end a state of emergency at any time, see Wis. Stat. § 323.10, the legislature chose not to do so with either Order #82 or Order #90 and instead filed an amicus brief in this court in support of Fabick's position.

4

II

¶89 Right off the bat, the majority makes a fundamental error, allowing Fabick to maintain this action despite his lack of standing. In doing so, it sub silentio overrules over a century of precedent requiring that there be some pecuniary loss in order for taxpayer standing to be established.

¶90 Why is standing so important? In answering that question, a review of the "cases and controversies" clause of the United States Constitution is informative. See U.S. Const. art. III, § 2. Although not binding on state court jurisdiction, the United States Supreme Court has generally interpreted this provision to define the proper role of the judiciary as limited to deciding only "cases and controversies."[5]

¶91 As this court has done, the United States Supreme Court has emphasized that courts are not to hand out advisory opinions on some future hypothetical case. Chafin v. Chafin, 568 U.S. 165, 172 (2013); State v. Grandberry, 2018 WI 29, ¶31 n.20, 380 Wis. 2d 541, 910 N.W.2d 214. The cases and controversies must be actual.

¶92 Likewise, Article III, Section 2 circumscribes who can maintain a court action. Courts are not to entertain cases from parties who do not have a legally recognized interest in the

---

[5] The Supreme Court has observed that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997). The case-or-controversy requirement of Article III requires plaintiffs to establish their standing to sue. Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

5

case. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006). That legally recognized interest is called "standing." Thus, standing is important both in federal court and Wisconsin courts because it reins in unbridled attempts to go beyond the circumscribed boundaries that define the proper role of courts.

¶93 Fabick seeks standing here as a taxpayer. He claims that he has standing simply because government employees thought about and implemented Orders #82 and #90 on government time.

¶94 Taxpayer standing is broad, but it is not limitless. See S.D. Realty Co. v. Sewerage Comm'n of City of Milwaukee, 15 Wis. 2d 15, 21-22, 112 N.W.2d 177 (1961). It is well settled in Wisconsin that "[i]n order to maintain a taxpayer's action, it must be alleged that the complaining taxpayer and taxpayers as a class have sustained, or will sustain, some pecuniary loss . . . ." Id. at 21. Such a principle is not new.

¶95 The lineage of the "pecuniary loss" requirement can be traced back over a century. Acknowledging this settled requirement for taxpayer standing, the S.D. Realty court cited McClutchey v. Milwaukee County, 239 Wis. 139, 140, 300 N.W. 224, (1941). S.D. Realty Co., 15 Wis. 2d at 21-22. McClutchey, in turn, cites a long list of cases dating back to 1914. See Kasik v. Janssen, 158 Wis. 606, 609, 149 N.W. 398 (1914) ("There is therefore no ground for the maintenance of a taxpayer's suit. Equity does not interfere with the rules or orders of an administrative officer at the suit of a taxpayer, unless the

6

taxpayer and his class have sustained or will sustain some pecuniary loss therefrom.").[6]

¶96 Fabick's argument contains no limiting principle at all and renders the doctrine of standing purely illusory. Under Fabick's rationale, any person could challenge any governmental action. This is not the law, nor should it be. For standing requirements to have any meaning, Fabick's standing must be denied.

¶97 Ignoring our long-established case law, the majority, however, determines that Fabick has standing to maintain his claim as a taxpayer despite his failure to establish any pecuniary loss whatsoever either to himself or to taxpayers as a whole. Majority op., ¶11. The majority arrives at its erroneous determination that Fabick has standing by conjuring its own justification, neither argued nor briefed by any party. Namely, it relies on state expenditures of taxpayer funds for deployment of the National Guard pursuant to the subject emergency declarations. Id. However, recent events significantly undermine the majority's summoned rationale.

¶98 On January 21, 2021, the new presidential administration issued an executive order instituting full federal reimbursement to states for National Guard expenses due

---

[6] See also Berger v. City of Superior, 166 Wis. 477, 166 N.W. 36 (1918); Murphy v. Paull, 192 Wis. 93, 212 N.W. 402 (1927); Milwaukee Horse & Cow Comm'n Co. v. Hill, 207 Wis. 420, 241 N.W. 364 (1932); Stuart v. City of Neenah, 215 Wis. 546, 255 N.W. 142 (1934).

7

to COVID-19 going forward.[7]  Then on February 2, 2021, it extended such reimbursement to states for 100 percent of expenses incurred in mobilizing the National Guard to address COVID-19, both going forward and retroactively.[8]

¶99 Full retroactive reimbursement makes the majority's reliance on state-incurred National Guard expenses to establish Fabick's taxpayer standing untenable.  Indeed, with this federal policy change, no state funds at all will be expended for National Guard deployment.  None.  Zero.  Thus, the majority cannot persuasively rely on such an expenditure to establish Fabick's standing.

¶100 The majority recognizes this change in federal policy, but does not take it at face value, instead determining that "[t]he imminent threat of unreimbursed costs, past and future, is sufficient to confer taxpayer standing on Fabick . . . ." Majority op., ¶11 n.5.  It cites Warden v. Hart, 162 Wis. 495, 497, 156 N.W. 466 (1916), for the proposition that a taxpayer

---

[7] Memorandum to Extend Federal Support to Governors' Use of the National Guard to Respond to COVID-19 and to Increase Reimbursement and Other Assistance Provided to States, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/extend-federal-support-to-governors-use-of-national-guard-to-respond-to-covid-19-and-to-increase-reimbursement-and-other-assistance-provided-to-states/ (Jan. 21, 2021).

[8] FACT SHEET:  President Biden Announces Increased Vaccine Supply, Initial Launch of the Federal Retail Pharmacy Program, and Expansion of FEMA Reimbursement to States, https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/02/fact-sheet-president-biden-announces-increased-vaccine-supply-initial-launch-of-the-federal-retail-pharmacy-program-and-expansion-of-fema-reimbursement-to-states/ (Feb. 2, 2021).

has standing when the taxpayer is merely "threatened with" a pecuniary loss.

¶101 But Warden, the only taxpayer standing case the majority cites in support, cannot be stretched this far. In Warden, the plaintiff sought to enjoin the excavation of a public street that had been planned and permitted. Id. The threat of injury was real and immediate.

¶102 In this case, however, there is no such real and immediate threat of pecuniary loss. On what is this "imminent threat" based, other than the majority's whimsical musing that the federal government may not do what it has said it will do? Such rank speculation underscores the majority's tenuous search for a viable theory upon which to justify the continuation of this action. Speculation of this ilk cannot, however, create an actual case or controversy and surely does not support Fabick's standing to maintain this case.

¶103 A party may have standing at the beginning of a case and then lose it as the case progresses. See, e.g., Craig v. Boren, 429 U.S. 190, 192 (1976); Kurtz v. Clark, 290 P.3d 779, 784 (Okla. Civ. App. 2012). The S.D. Realty court compared taxpayer standing to shareholder standing: "[A] taxpayer does have a financial interest in public funds which is akin to that of a stockholder in a private corporation." S.D. Realty Co., 15 Wis. 2d at 22. And Northern Air Services, Inc. v. Link, 2011 WI 75, ¶83, 336 Wis. 2d 1, 804 N.W.2d 458, makes clear that if you no longer own shares of stock, you no longer have standing to

9

maintain a shareholder action.[9]  The same principle should apply here.

¶104 Accordingly, even assuming Fabick had standing to bring this action in the first instance, he certainly has lost it due to the new policy of 100 percent federal reimbursement for states' National Guard expenses.  In its quest to get its teeth into this dispute, the majority ignores this fundamental deficiency in allowing Fabick's case to proceed.

¶105 The effect of the majority's standing analysis is not limited only to this and future taxpayer cases, but it necessarily affects the vitality of our past precedents. Indeed, what of the "pecuniary loss" requirement to which we have adhered for over a century?  Without saying a word about it, the majority appears to overrule a multitude of cases[10] and ignores our well-established precedent which requires a taxpayer to establish some sort of pecuniary loss to maintain standing. Because Fabick is unable to meet this requirement, I conclude that he lacks standing to maintain this action.

---

[9] See N. Air Servs., Inc. v. Link, 2011 WI 75, ¶83, 336 Wis. 2d 1, 804 N.W.2d 458 ("On June 30, 2009, when Jay surrendered his shares in Link Snacks under the Buy-Sell Agreement, he was no longer a 'shareholder' in Link Snacks, as that term is defined by the Wisconsin Business Corporation Law. Consequently, Jay no longer has standing to maintain an oppression claim under Wis. Stat. § 180.1430(2)(b).").

[10] See, e.g., Kasik v. Janssen, 158 Wis. 606, 149 N.W. 398 (1914); Berger, 166 Wis. 477; Murphy, 192 Wis. 93; Milwaukee Horse & Cow Comm'n Co., 207 Wis. 420, Stuart, 215 Wis. 546; McClutchey v. Milwaukee Cnty., 239 Wis. 139, 300 N.W. 224 (1941); S.D. Realty Co. v. Sewerage Comm'n of City of Milwaukee, 15 Wis. 2d 15, 112 N.W.2d 177 (1961).

III

¶106 The majority also errs in its interpretation of the plain language of the relevant statutes, Wis. Stat. §§ 323.02(16) and 323.10. When properly focused on the actual words of these statutes, the plain language does not support the majority's interpretation. Rather, a plain language analysis establishes that emergency declarations are permissible when, like the orders at issue here, they are based on separate statutory "occurrences," even if those occurrences share the same underlying cause.

¶107 The majority misses the mark when it fails to recognize that the key word for analysis in this case lies in the statutory definition of a "public health emergency" provided by Wis. Stat. § 323.02(16). That key word is "occurrence." Instead, the majority puts on blinders and does not engage with the term at all.

¶108 Legally speaking, this case presents a straightforward issue of statutory interpretation. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id., ¶46.

11

¶109 There are two statutes relevant to the analysis, Wis. Stat. §§ 323.02(16) and 323.10. Section 323.10 sets forth the Governor's authority to declare a state of emergency. It provides in relevant part:

> If the governor determines that a public health emergency exists, he or she may issue an executive order declaring a state of emergency related to public health for the state or any portion of the state and may designate the department of health services as the lead state agency to respond to that emergency. . . . A state of emergency shall not exceed 60 days, unless the state of emergency is extended by joint resolution of the legislature. . . . The executive order may be revoked at the discretion of either the governor by executive order or the legislature by joint resolution.

¶110 As a starting point, the emergency declarations at issue in this case arise from a "public health emergency," as the majority agrees. Majority op., ¶24. Thus, my focus zeroes in on that term as we examine: what is a public health emergency?

¶111 This is where Wis. Stat. § 323.02(16) joins the equation. Indeed, "public health emergency" is a defined term pursuant to that statute. It means "the occurrence or imminent threat of an illness or health condition that . . . [i]s believed to be caused by . . . a novel or previously controlled or eradicated biological agent." § 323.02(16). The statute further defines a "public health emergency" as requiring that the occurrence or threat poses a high probability of either "[a] large number of deaths or serious or long-term disabilities among humans" or "[a] high probability of widespread exposure to a biological, chemical, or radiological agent that creates a

12

significant risk of substantial future harm to a large number of people." Id.

¶112 Without further interpretation, the definition of public health emergency by itself does not resolve our inquiry. This statutory definition of "public health emergency" turns on whether there is an "occurrence" or a "threat" of an illness or health condition that fulfills the statutory criteria. Thus, a "public health emergency" may be declared either upon the occurrence or upon the imminent threat of an illness or health condition.

¶113 I focus on the term "occurrence" rather than "threat" because Orders #82 and #90 were issued in response to "occurrences" that have already taken place. The new spike in infections drove Order #82 and Order #90 was issued because of the significant increase in the spread of the virus occasioned by the beginning of the school year.[11]

---

[11] The majority mischaracterizes this dissent as "ignor[ing] that a 'public health emergency' may be declared upon either 'the occurrence or imminent threat of an illness or health condition.'" Majority op., ¶23 n.7. As explained above, I focus on the term "occurrence" rather than "threat" simply because Orders #82 and #90 were issued in response to "occurrences" that have already taken place. If anything, the inclusion of "threat" in addition to "occurrence" broadens the circumstances under which a public health emergency may be declared.

Further, the majority decries the fact that "occurrence" does not appear in Wis. Stat. § 323.10. Id. True enough. But it does appear in Wis. Stat. § 323.02(16), and there is a straight line between the two statutes. Section 323.10 includes the phrase "public health emergency," which is in turn defined by § 323.02(16) to include an "occurrence." The connection is not hard to follow.

13

¶114 In the absence of any statutory definition, and without any case law interpreting the term "occurrence" in the context of Wis. Stat. § 323.02(16), our task is to determine its common, ordinary, and accepted meaning. Kalal, 271 Wis. 2d 633, ¶45. A dictionary may aid us in our interpretation, so that is where I begin.[12]

¶115 A commonly accepted dictionary defines "occur" as "to take place" or "come about."[13] We need not look far to find an application of a highly similar definition in our case law, as this court has previously stated that the "ordinary and common meaning of 'occurrence' is 'something that takes place; something that happens unexpectedly and without design.'" Kremers-Urban Co. v. Am. Emp.'s Ins. Co., 119 Wis. 2d 722, 741, 351 N.W.2d 156 (1984); see Kalal, 271 Wis. 2d 633, ¶45 (explaining that statutory language is given "its common, ordinary, and accepted meaning"). Contrary to the majority's overly simplistic view, "occurrence" is a very broad term. Nothing about this definition leads to the conclusion that an "occurrence" coincides with the first appearance of a disease only.

¶116 Applying our established definition of "occurrence" to Orders #82 and #90, it is apparent that each is based on a new

---

[12] See State v. Sample, 215 Wis. 2d 487, 499, 573 N.W.2d 187 (1998) ("For purposes of statutory interpretation or construction, the common and approved usage of words may be established by consulting dictionary definitions.").

[13] Occur, American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=occur (last visited Mar. 29, 2021).

set of on-the-ground facts, with each new set of facts posing a high probability of either "[a] large number of deaths or serious or long-term disabilities among humans" or "[a] high probability of widespread exposure to a biological . . . agent that creates a significant risk of substantial future harm to a large number of people." See Wis. Stat. § 323.02(16). Thus, the orders were issued in response to separate occurrences and are permissible under the plain language of §§ 323.02(16) and 323.10.

¶117 Unlike Order #72, which was premised on preparing Wisconsin for the fight against COVID-19, Order #82 declared a new public health emergency in response to a "new and concerning spike in infections" that without quick intervention "will lead to unnecessary serious illness or death, overwhelm our healthcare system, prevent schools from fully reopening, and unnecessarily undermine economic stability . . . ." Order #82 detailed that "on June 1, 2020, there were 18,543 confirmed cases of COVID-19 in Wisconsin; on July 1, 2020, there were 29,199 confirmed cases of COVID-19, a 57 percent increase from June 1; and on July 29, 2020, there were 51,049 confirmed cases of COVID-19, a 75 percent increase from July 1."

¶118 Accordingly, Order #82 was issued in response to a specific and discrete occurrence. The "new and concerning spike in infections" is certainly "something that takes place" that poses a high probability of widespread transmission risking future harm to a large number of people, i.e. an occurrence

15

separate and apart from the need to prepare for COVID-19's impact that drove Order #72.

¶119 Likewise, Order #90 was issued in response to a different specific and discrete occurrence. It was premised on facts indicating that COVID-19's "exponential growth is being driven by new factors not present before, primarily the significant increase in spread due to the beginning of the K-12 and collegiate school years, which all began on or about September 1, and the unprecedented number of infections among 18-24 year-olds . . . ." Again, the increase in spread due to the beginning of the school year is "something that takes place" that poses a high probability of widespread exposure that threatens broad swaths of Wisconsinites, i.e. an occurrence separate and apart from the occurrences cited in Orders #72 and #82.

¶120 While COVID-19 may be the underlying cause of the conditions that gave rise to Orders #72, #82, and #90, the disease itself is not the statutory "occurrence" on which the orders are premised. In other words, the "occurrence" underlying each subject order is not the pandemic itself, but conditions that the pandemic has caused.

¶121 At oral argument, Fabick acknowledged the correctness of such a proposition, undercutting his argument that there cannot be another public health emergency declared due to the COVID-19 pandemic. In response to a question from the court regarding whether hospitals being overrun could constitute a separate occurrence under the statute, Fabick's counsel

16

responded: "The Governor could issue a separate order that is targeted to the specific problem."[14] That is exactly what the Governor has done here.

¶122 Wisconsin Stat. § 323.10 prohibits the Governor from extending a state of emergency past 60 days absent the approval of the legislature. By issuing Orders #82 and #90, the Governor has not extended a pre-existing state of emergency, but instead has issued new emergency declarations based on new underlying occurrences. Accordingly, I determine that under the plain language of the statutes Orders #82 and #90 are permissible exercises of the authority granted to the Governor in § 323.10.[15]

---

[14] In more detail, the exchange proceeded as follows:

The Court: Let's just say, hypothetically, all of our hospitals are overrun . . . and we get to a point where there needs to be action taken, it's your position that because one emergency was issued, one state of emergency, based on an ongoing public health emergency or public health crisis, the Governor could do nothing in terms of declaring a state of emergency because the hospitals have been overrun, which could be another occurrence, correct?

Fabick's counsel: Well, if we're dealing with a targeted scenario, short supply of hospital equipment, the Governor could issue a separate order that is targeted to the specific problem.

[15] Because I determine that Orders #82 and #90 are permissible pursuant to Wis. Stat. § 323.10, I must reach the issue that the majority does not, i.e. the argument that § 323.10 constitutes an unconstitutional delegation of legislative power to the executive. This argument can be quickly dispatched.

17

¶123 This interpretation is buttressed by the fact that an alternative "one and done" statutory interpretation, which in the main is advanced by Fabick, puts forth a position that leads to absurd or unreasonable results contrary to both common sense and recent practice. See Kalal, 271 Wis. 2d 633, ¶46 (explaining that we must interpret statutes "reasonably, to avoid absurd or unreasonable results").[16]

_____

This court has recently acknowledged that "[c]onstitutional law has generally permitted the Governor to respond to emergencies without the need for legislative approval." Wisconsin Legislature v. Palm, 2020 WI 42, ¶41, 391 Wis. 2d 497, 942 N.W.2d 900. Such a clear statement from this court indicates that emergency response is at the very least a shared power between the legislative and executive.

In examining a nondelegation argument in the context of a shared power, this court "normally review[s] both the nature of delegated power and the presence of adequate procedural safeguards, giving less emphasis to the former when the latter is present." Panzer v. Doyle, 2004 WI 52, ¶55, 271 Wis. 2d 295, 680 N.W.2d 666.

Here, there is a safeguard in place in the form of the legislature's ability to revoke any state of emergency the Governor may declare. See Wis. Stat. § 323.10 ("The executive order may be revoked at the discretion of . . . the legislature by joint resolution.") Indeed, it must be asked how there could be an impermissible delegation of power when the legislature retains full authority to revoke any state of emergency the governor may issue.

[16] The majority mischaracterizes this dissent as arguing that the assertion "that a governor's power to act on an emergency basis would be temporary and terminable by the legislature" creates an absurd result. Majority op., ¶36 n.16. This contention by the majority is simply a straw man set up only to be inexorably torn down. Of course, it is not the statutory scheme that is absurd, but the majority's interpretation of limiting the governor to one emergency declaration per underlying cause.

18

¶124 As an illustration of the absurdity of this alternative interpretation, consider an example taken from the Governor's brief. Imagine heavy rains leading to a flood that two months later causes a dam to break. If the governor declared a state of emergency because of the initial flooding, he could not issue another for the new flood caused by the dam failure because it shares an underlying cause with the previous state of emergency. This simply could not be the legislature's intent.

¶125 Such an interpretation would cause the Governor to engage in a perverse calculation regarding when to use an emergency declaration——should he issue it now or save it and wait to see how bad things get? This undermines the very concept of an emergency: something is happening right now that demands swift action without delay.

¶126 To further illustrate that this alternative interpretation is unreasonable, I look to recent practice. Indeed, from the Fall of 2013 through the Winter of 2014, Governor Walker issued seven executive orders related to propane shortages and the resulting energy emergency.[17] Then again from the Fall of 2016 through the Winter of 2017, Governor Walker declared two successive states of emergency to waive load limits for petroleum transportation due to a pipeline shutdown and long

---

[17] Office of the Wisconsin Governor, Executive Order No. 120 (Oct. 25, 2013); No. 121 (Nov. 7, 2013), No. 122 (Nov. 15, 2013); No. 124 (Nov. 27, 2013); No. 128 (Dec. 23, 2013); No. 130 (Jan 25, 2014); No. 132 (Apr. 17, 2014), https://docs.legis.wisconsin.gov/code/executive_orders/2011_scott_walker/.

wait times at supply terminals.[18] Fabick acknowledged at oral argument that, despite his purported concern for a governor overstepping his statutory authority, he did not challenge these emergency declarations. Perhaps they went unchallenged because, as Fabick has implicitly acknowledged, it makes no sense to hamstring a governor's ability to meet the emergencies faced by the people of Wisconsin by limiting emergency power to only one underlying cause——regardless of whom is governor.

¶127 Thus, in the recent past, a governor has declared numerous states of emergency premised on the same underlying causes. Yet the majority reverses course from this established practice and common sense to arrive at its unreasonable result.

¶128 An examination of the extreme consequences further highlights the conclusion that this alternative interpretation renders absurd or unreasonable results. The majority in large part embraces this alternative interpretation, yet it attempts to obscure the consequences of its declaration that the Governor lacked authority to issue Executive Orders #82 and #90. In a one sentence footnote towards the end of its opinion, the majority acknowledges the consequence of its declaration: "[a]s a necessary consequence [of its decision], all executive actions and orders issued pursuant to the powers triggered by the

---

[18] Office of the Wisconsin Governor, Executive Order No. 223 (Nov. 4, 2016); No. 227 (Dec. 30, 2016), https://docs.legis.wisconsin.gov/code/executive_orders/2011_scott_walker/.

20

emergency declaration are likewise void." Majority op., ¶43 n.19.[19]

¶129 Yet, in spite of the astounding breadth of the asserted consequence of the majority's declaration, it takes this dissent to task for even discussing the absurdity or reasonableness of some of those consequences. See id., ¶15 n.6. Surely, when enacted, the legislature could not have intended that Wis. Stat. §§ 323.02(16) and 323.10 would be interpreted to place such a roadblock to effective governmental response to a worldwide pandemic.

¶130 Among the powers hamstrung by the majority are critical executive powers set forth by statute that may be exercised only in a public health emergency——powers that are essential to saving lives and getting a rapidly-spreading disease under control.

¶131 As the majority acknowledges, during a public health emergency DHS is empowered to take critical steps to ameliorate the emergency. See majority op., ¶35. Yet, these steps can be

---

[19] Both Order #82 and #90 set the stage for additional emergency measures necessitated by the spread of COVID-19. Specifically, pursuant to Orders #82 and #90, the Governor issued several emergency orders mandating the wearing of masks as a means of stemming the spread of COVID-19.

For example, Governor Evers issued Emergency Order #1 pursuant to Order #82 on July 30, 2020. See Emergency Order #1, https://evers.wi.gov/Documents/COVID19/EmO01-FaceCoverings.pdf (July 30, 2020). This emergency order required all individuals age five and older to wear a face covering in all indoor and enclosed spaces other than private residences when another person not a member of the individual's household is present in the same room or enclosed space.

accomplished only "during the period under which the department is designated as the lead state agency," which in turn requires a declaration of a public health emergency. Wis. Stat. § 252.041(1). Absent an emergency declaration, do these powers simply vanish?

¶132 For example, during a public health emergency, DHS's power includes the essential steps of purchasing vaccine, antibiotics, and medical supplies. Wis. Stat. § 250.042(2)(a).[20] Again, absent an emergency declaration, do these statutory purchasing powers simply vanish?

¶133 Additionally, absent an emergency declaration, Wisconsin also risks losing significant federal allotments to mitigate the economic effects of this pandemic. Section 2302(2)(a) of the federal Families First Coronavirus Response Act conditions the receipt of emergency supplemental nutrition allotments on the declaration of states of emergency at both the federal and state levels. The nonpartisan Legislative Fiscal Bureau indicated that Wisconsin risks losing nearly $50 million per month in FoodShare assistance absent an emergency declaration.[21] An absurd result indeed. Without such measures, what are we left with as we continue the battle against COVID-19

---

[20] Wisconsin Stat. § 250.042(2)(a) provides that as the public health authority pursuant to an emergency declaration, DHS may "[p]urchase, store, or distribute antitoxins, serums, vaccines, immunizing agents, antibiotics, and other pharmaceutical agents or medical supplies that the department determines are advisable to control a public health emergency."

[21] Alexandra Bentzen, Legislative Fiscal Bureau, Impact of Ending the State Public Health Emergency on Emergency FoodShare Allotments (Jan. 27, 2021).

22

and its fallout? As Judge Rovner recently wrote, "Good luck and G-d bless, Wisconsin. You are going to need it." Democratic Nat'l Comm. v. Bostelmann, 977 F.3d 639, 656 (7th Cir. 2020) (Rovner, J., dissenting).

IV

¶134 Finally, abandoning any vestige of judicial restraint, the majority denies a motion that was actually made yet reaches out and grants a motion that was never made. Fabick filed a motion for a temporary injunction on February 9, 2021, requesting that Order #105 be temporarily enjoined and Governor Evers filed a response to that motion on February 22, 2021.

¶135 Although declared moot, Fabick's motion could never have been granted. Fabick did not sufficiently allege, let alone attempt to demonstrate that he would suffer any particularized irreparable harm——a requisite showing in order to secure any temporary injunction.[22] Faced with an inability to

---

[22] A temporary injunction is not to be issued unless (1) the movant will likely suffer irreparable harm in the absence of an injunction; (2) the movant has no other adequate remedy at law; (3) a temporary injunction is necessary to preserve the status quo; and (4) the movant has a reasonable probability of success on the merits. Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶93, 393 Wis. 2d 38, 946 N.W.2d 35. Competing interests must be reconciled and the petitioner must satisfy the court that on balance equity favors issuing the injunction. Pure Milk Prods. Co-op v. Nat'l Farmers Org., 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979).

23

grant the temporary injunction motion, what is the majority to do? It reaches out and instead grants a motion for a permanent injunction of Order #105——a motion that was never made.

¶136 Apparently the majority fails to recognize that the granting of a permanent injunction also requires a showing of irreparable harm. Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 521, 259 N.W.2d 310 (1977) ("While standards for the granting of temporary and permanent injunctive relief differ . . . a showing of irreparable injury and inadequate remedy at law is required for a temporary as well as for a permanent injunction."). But with no irreparable harm sufficiently alleged and none whatsoever demonstrated, it is no surprise that the majority says nothing about it. How could it? Perhaps the better question is how could the majority grant a permanent injunction without it?

¶137 Nevertheless, the majority soldiers on. As justification for its reach, the majority appears to suggest that a permanent injunction motion was made "in post-argument motions . . . ." Majority op., ¶41 (emphasis added). That is incorrect. There was but a singular post argument motion by

---

Yet nowhere in the majority's analysis are the factors necessary to grant either a temporary or permanent injunction even mentioned. The factors likely aren't mentioned because Fabick plainly does not meet them. Fabick has not established that he (or any Wisconsin taxpayer) will suffer any harm, much less irreparable harm. In conclusory fashion, he asserts that taxpayers are harmed by "wasted public expenditures" due to staff time drafting, promoting, and enforcing Order #105. But he does not make any argument that this supposed harm is irreparable, and we will not develop one for him.

24

Fabick[23] that requested any injunctive relief at all and it was for a temporary injunction. Similarly the majority justifies its reach by suggesting that it makes its decision on a permanent injunction "[a]fter hearing from both parties . . . ." Id. But to the extent that this artful drafting suggests that the court actually heard anything from the parties on the issue, it is misleading. There was neither developed argument nor any analysis advanced by either party on the issue of a permanent injunction.

¶138 Ultimately, as the sole justification for its overreach, the majority points to Fabick's "request [for] permanent relief." Id., ¶41 n.17. This "request [for] permanent relief" consists of a twice repeated sentence found in Fabick's brief in support of his motion for a temporary injunction in which he asks the court to "ultimately grant a permanent injunction as part of its final judgment." If the majority is going to permanently enjoin an executive order of the Governor, it should do so based on more than a stray request tucked away in a brief that, in its very title, sets forth that it is filed in support of a motion for temporary injunction only. Thus, with a complete failure of demonstrating the required irreparable harm, with unpersuasive justification and with scant analysis, the majority permanently enjoins Order #105 and declares it unlawful. See id., ¶¶42-43.

---

[23] The Legislature filed a motion to participate as amicus in support of Fabick's motion for temporary injunction, but in its brief addressed the nondelegation doctrine only.

25

¶139 Recognizing that a permanent injunction is functionally the equivalent of a declaratory judgment, the majority denominates its decision as one for declaratory judgment. But merely changing the label does not remove the majority's problem with its overreach: no motion for declaratory judgment regarding Order #105 was made by Fabick.

¶140 What makes the majority's reach even more untenable is that Fabick has no standing to maintain this action. And if that is not sufficient to cause the majority to pause, add to the mix that Order #105 is not properly before the court. It did not exist when this case was filed and thus could not have been included in the petition for original action Fabick filed.

¶141 Reaching outside of the orders that were actually challenged in this case to decide an issue not raised in the petition for original action is unsound judicial practice. It grants an end run around Wis. Stat. § (Rule) 809.70(1)(a), which requires that a petition for original action state the issues presented by the controversy.

¶142 The consideration of Order #105 at this late juncture injects a new issue into this case that was not in existence when the case was filed, briefed, or argued. Yet the majority allows Fabick to litigate what should be a wholly separate case as a motion for temporary injunctive relief. And further, as set forth above, it is a wholly separate case that Fabick does not have standing to bring. Accordingly, I would deny Fabick's attempt to backdoor a new claim into this court's consideration.

26

¶143 The majority's scant analysis of Order #105 fares no better. Despite purporting to strictly interpret the text of Wis. Stat. § 323.10, the majority's conclusion regarding Order #105 finds no textual support. The text of § 323.10 grants the governor authority to issue an order declaring a state of emergency and the legislature the power to "revoke[]" that order. Nowhere, however, does the statute's plain text endow the legislature with the power to prevent the governor from issuing such an order in the first place. § 323.10. The definition of "revoke" clearly limits the legislature's power as reactive, not preventative: "To annul or make void by taking back or recalling; to cancel, rescind, repeal, or reverse." Revoke, Black's Law Dictionary 1580 (11th ed. 2019). The Governor's issuing a new order after the legislature revokes a prior, different order is not an "end run" around the statute; it is a function of the statute as the legislature enacted it.

¶144 If the statute's plain text results in those two co-equal branches wielding their competing authority against one another in what the majority calls "a game of whac-a-mole between the governor and the legislature," majority op., ¶43, then so be it. Generally, we have to take the statute's plain and clear text "as we find it." Montello Granite Co. v. Schultz, 197 Wis. 428, 432, 222 N.W. 315 (1928). Only by impermissibly "read[ing] words into the statute that the legislature did not write" could the majority reach the result it wants. Cf. State v. Schultz, 2020 WI 24, ¶52, 390 Wis. 2d 570, 939 N.W.2d 519. Not only is Executive Order #105

27

improperly before the court, the specific remedy Fabick seeks on that order is in the legislature's hands, not ours.

¶145 I conclude with an observation about the application of the majority opinion to future emergency declarations. Despite all of its tough talk regarding the Governor's ability to declare public health emergencies and its declaration against Order #105, the majority acknowledges that "determining when a set of facts gives rise to a unique enabling condition may not always be easy." Majority op., ¶39. In making such an acknowledgement, the majority necessarily admits that this opinion may not be the final word on emergency declarations due to conditions caused by COVID-19.

¶146 Although we are more than a year into this pandemic, we do not know what it will throw at us next. Even under the majority's analysis, the threshold question remains whether a new "enabling condition" exists (I, of course, would phrase the question in the term the statute uses, "occurrence").

¶147 In sum, the majority opinion sub silentio overrules over a century of precedent related to taxpayer standing and fails to discuss the essential statutory term "occurrence," while obscuring the consequences of its decision. It further reaches out and, without any textual support, strikes down Order #105, which is not properly before the court in the first place. Ultimately, in the midst of public emergencies such as a global pandemic, it hampers the ability of governors to safeguard the health and lives of the people of Wisconsin.

¶148 For the foregoing reasons, I respectfully dissent.

28

¶149 I am authorized to state that Justice REBECCA FRANK DALLET and Justice JILL J. KAROFSKY join this dissent.